UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

D.O. ALVIN HERSHFELD and MEDICAL
OFFICE OF HOWARD BEACH, P.C.,

                                    Plaintiffs,

                    - against -

JM WOODWORTH RISK RETENTION
GROUP, INC., SALVATORE LEONE, and
SANTA LEONE,

                                    Defendant.

**MEMORANDUM
DECISION AND ORDER**

16 Civ. 6369 (BMC)

**COGAN**, District Judge.

Plaintiffs Alvin Hershfeld, D.O. and Medical Office of Howard Beach, P.C. commenced this declaratory judgment action in the Supreme Court of the State of New York, Queens County, based on JM Woodworth Risk Retention Group, Inc.'s ("JMW") disclaimer of malpractice insurance coverage in a personal injury action brought by defendants Salvatore and Santa Leone. JMW removed the action to this Court based on diversity of citizenship, and plaintiffs have moved to remand the action, contending, *inter alia*, that both they and JMW are New York citizens. I agree with plaintiff; at all relevant times, JMW has been, and still is, a New York citizen, as are plaintiffs. There is no diversity of citizenship and therefore no subject matter jurisdiction. Pursuant to 28 U.S.C. § 1447(c), plaintiffs' motion to remand is therefore granted.

## BACKGROUND

### I. **The Parties**

Alvin Hershfeld is a physician licensed in New York and employed by the Medical Office of Howard Beach, which is incorporated and maintains its principal place of business in

New York.  JMW, a risk retention group (a species of specialty insurance companies), formerly underwrote medical malpractice insurance policies predominantly in New York.  JMW is a corporation organized under the laws of the State of Nevada.  Three of JMW's four directors are located in New York, either in Syracuse, Rochester, or Oneida.  Skip Pleninger, the director from Rochester, also serves as JMW's Chairman, Vice President, and Secretary.

According to JMW, JMW has never had its own employees.  Before 2014, JMW had delegated day-to-day operations of its business to Uni-Ter Underwriting Management Corporation ("Uni-Ter"), a Delaware corporation with its principal place of business in Georgia.  As a result of alleged mismanagement, in early 2014, JMW replaced Uni-Ter and delegated its executive functions and day-to-day operations to Allied Professionals Insurance Services, Inc. ("APIS"), a corporation organized and existing under the laws of the State of California, having a principal place of business in California.  New York State suspended JMW's authority to issue policies in New York State as of March 13, 2015, and on the same day, the State of Nevada approved a Voluntary Suspension of the Certificate of Authority for JMW to underwrite insurance coverage.  JMW is thus currently in run-off, with APIS in charge of administering claims under JMW's previously written policies.

JMW issued a policy to Hershfeld and the Medical Office, effective July 1, 2011, through July 1, 2013, and retroactive to July 1, 2008.  In December 2013, defendants Salvatore and Santa Leone filed a medical malpractice suit in New York State Supreme Court, Queens County, Salvatore Leone and Santa Leone v Alvin Hershfeld, D.O. and Medical Office of Howard Beach, P.C., Queens County Index No.: 705826/2013 ("the Leone action"), arising out of alleged medical malpractice by plaintiffs in November 2011.

JMW initially provided coverage for plaintiffs' defense, indemnification, and legal representation, hiring Harter Seacrest & Enery, P.C. of Rochester to defend the <u>Leone</u> action. In early 2015, JMW substituted the law firm of Marks O'Neill O'Brien Doherty & Kelly, P.C. in place of Harter Seacrest.

On January 29, 2016, while the <u>Leone</u> action was on the trial calendar, JMW disclaimed coverage under the policy and ceased funding the defense. Marks O'Neill continued to provide legal representation until March 29, 2016, when it moved to withdraw for non-payment of its legal fees. The state court denied the motion to withdraw, and Marks O'Neill did not appeal. Plaintiffs allege that Marks O'Neill can no longer ethically defend them and in any event are unacceptable as defense counsel.

At the time that plaintiffs first filed the instant declaratory judgment matter in state court, JMW was refusing to defend and indemnify plaintiffs. At some subsequent point in time, JMW resumed paying Marks O'Neill to defend, but under a reservation of rights on the indemnity and defense obligations.

On November 16, 2016, JMW removed the declaratory judgment action to federal court, alleging diversity of jurisdiction. It is undisputed that Hershfeld and the Medical Office are New York citizens and that the Leones are also New York citizens. As to the Leones, JMW argues that the Court can disregard their citizenship because the Leones are nominal parties whose citizenship is irrelevant. JMW argues that its principal place of business is in California based on the California activities of APIS on JMW's behalf; further, because JMW is incorporated in Nevada, it is not a New York citizen for diversity purposes.

II.  **JMW's Previous Positions Regarding Its Citizenship**

Several other federal courts have considered JMW's citizenship for diversity purposes. First, in JM Woodworth Risk Retention Group, Inc. v. Uni-Ter Underwriting Management Corp., No. 2:13-CV-0911 (D. Nev. August 4, 2014) (the "Uni-Ter action" or" Uni-Ter"), the court held that JMW's principal place of business was in New York.  This was the position that JMW had urged the Court to take.  (JMW had argued in the alternative that if New York was not its principal place of business, then it was Georgia based on Uni-Ter's actions in Georgia on its behalf.)  All of JMW's board members submitted affidavits averring that all corporate decision-making took place in New York and that the Board of Directors, acting in New York, ratified all actions taken on behalf of the corporation.

While the Uni-Ter motion to remand was *sub judice*, JMW commenced another action in this district in which it alleged, contrary to its position in Nevada, that it was not a New York citizen.  J.M. Woodworth Risk Retention Grp., Inc. v. Wyckoff Heights Med. Ctr., No. 13-cv-00750 (E.D.N.Y.) ("Wyckoff Heights").  It relied on a close variation of its theory in the instant case – that the court should impute the location (Georgia) where its agent (at that time, Uni-Ter) performed insurance services on JMW's behalf as determinative of JMW's principal place of business.  It acknowledged, however, that if the court in Uni-Ter accepted its argument that it was a New York citizen, then diversity would be lacking in the Wyckoff Heights case.  When the Uni-Ter court did, in fact, rule that JMW was a New York citizen, the Wyckoff Heights court dismissed the action for lack of diversity jurisdiction.

In JM Woodworth Risk Retention Group Inc. v. Family Medical Practice of Bay Shore PC, No. 15-cv-03625 (E.D.N.Y.), JMW invoked diversity jurisdiction based on yet another

argument – that its principal place of business is in Nevada.  It does not appear that any of the parties raised an issue with respect to the court's subject matter jurisdiction.

## DISCUSSION

### I.    Controlling Principles

For purposes of establishing diversity jurisdiction, a corporation is deemed a citizen of the state where it has it principle place of business and of the state where it is incorporated.  28 U.S.C. § 1332(c).  In turn, 28 U.S.C. § 1441 sets out the general federal framework governing removals from state to federal court; it provides that a defendant may remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction."  28 U.S.C. § 1441(a).  Section 1441(b) provides, however, that an action is not removable if the district court's original jurisdiction is based on diversity of citizenship and any of the defendants "is a citizen of the State in which such action is brought."  Id. § 1441(b).

Once a case has been removed to federal court, 28 U.S.C. § 1447(c) provides that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).  "When a party challenges the removal of an action from state court, the burden falls on the removing party 'to establish its right to a federal forum by competent proof.'"  In re Methyl Tertiary BUtyl Ether Prods. Liab. Litig., No. 1:00-CV-1898, MDL 1358, 2006 WL 1004725, at *2 (S.D.N .Y. Apr. 17, 2006) (quoting R.G. Barry Corp. v. Mushroom Makers, Inc., 612 F.2d 651, 655 (2d Cir. 1979)).

In addition, "[i]n light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability."  Lupo v. Human Affairs Int'l, Inc., 28 F.3d 269, 274 (2d Cir. 1994) (citing Shamrock Oil & Gas Corp. v.

Sheets, 313 U.S. 100, 108 (1941)). When removal is based on diversity, there must be diversity both at the time that the plaintiff filed the action in state court and at the time of removal. Grupo Dataflux v. Atlas Global Grp., L.P., 541 U.S. 567, 570-71 (2004); United Food & Commercial Workers Union, Local 919, AFL-CIO v. Ctr. Mark Props. Meriden Square, Inc., 30 F. 3d 298, 301 (2d Cir. 1994); Vasura v. Acands, 84 F. Supp. 2d 531, 535 (S.D.N.Y. 2000).

## II.    JMW's "Nerve Center"

The first task before me is to determine JMW's principal place of business at the time of the filing of the declaratory judgment action and at the time of removal. The "principal place of business" refers to "the place where a corporation's officers direct, control, and coordinate the corporation's activities." Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010). "It is the place that Courts of Appeals have called the corporation's 'nerve center.'" Id. at 93. "In practice it should normally be the place where the corporation maintains its headquarters – provided that the headquarters is the actual center of direction, control, and coordination . . . and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." Id.

This question is an easy one. JMW is a citizen of Nevada and New York. First, JMW was incorporated in Nevada, making it a citizen of Nevada. Second, New York is the location of JMW's nerve center, *i.e.*, the place where its board of directors conducts business.

JMW's contention that the California citizenship of APIS should be imputed to it because APIS runs JMW's administration out of California is wrong. Citizenship can neither be delegated nor imputed. Two lines of case law converge to demonstrate this.

First is the case law on holding companies. The relationship between a holding company that, by definition, carries on no active business, and its wholly-owned subsidiary, the latter of

which acts as the operating company, bears similarities to the relationship between JMW and APIS. Neither a holding company nor JMW conducts daily business; they each have their daily operations conducted by another, separate company. High-level corporate policy decisions are made by the holding company, not the subsidiary, just as such decisions are made by JMW, not APIS. If the board of a holding company wants to change the management of its operating subsidiary, it is free to do so, just as JMW terminated Uni-Ter and hired APIS. Any revenue that is not needed or used by the operating subsidiary is returned to the holding company; APIS, if it retains net reserves after paying claims, expenses, and its fees, will remit the remainder to JMW, to be disposed of according to insurance law.

Several cases have held that a holding company's use of operating subsidiaries does not replace the citizenship of the holding company with the subsidiary for diversity purposes, even though, again by definition, the holding company is conducting no day-to-day business. These cases recognize that a holding company's decision to conduct only high-level activities and delegate day-to-day operational authority is representative of all holding companies. Johnson v. SmithKline Beecham Corp., 853 F. Supp. 2d 487, 494 (E.D. Pa. 2012), aff'd, 724 F.3d 337 (3d Cir. 2013). As the court in Johnson held, in refusing to impute the operating activities of an indirectly owned limited liability company to a parent holding company,

> [t]he activities of an operating company and those of a holding company are obviously different. As innumerable courts have observed, holding companies do not run the entities they own; rather, all holding companies do is "hold." . . .
>
> In these circumstances, Holdings's decision to conduct only ownership activities and "delegate" operational authority is typical of all holding companies and determines neither Holdings's nor LLC's citizenship.

853 F. Supp. 2d at at 494; see also S & T Oil Equip. & Mach., Ltd. v. Juridica Invs. Ltd., No. 11–542, 2011 WL 1565996, at *3 (S.D. Tex. Apr. 25, 2011) (holding that the nerve center of a

purported shell company was where the board of directors met).[1]  Cf. Jennings v. HCR

Manorcare Inc., 901 F. Supp. 2d 649 (D.S.C. 2012) (rejecting claim that limited liability

company's principal place of business was where it operated given that the LLC's member was a

holding company, making the citizenship of the holding company controlling).

If the "nerve center" of an operating subsidiary is not imputed to its parent holding

company, it is even clearer that the citizenship of APIS cannot be imputed to JMW.  JMW, of

course, has no ownership interest in APIS and, therefore, not nearly even the level of control that

a holding company has over its operating subsidiary.  Any control that JMW has over APIS is

strictly a creature of the contractual arrangement to which they have both agreed.

JMW has chosen strategically to tell me little about its relationship with APIS, but the

federal docket makes it clear that APIS is an independent contractor that serves as an insurance

services administrator for an unknown number of insurance companies or risk retention groups

of which JMW is only one.  In Allied Professional Insurance Services v. Allied Professionals,

Inc., No. 14-cv-2032 (C.D. Ca.) (Complaint, ECF 1), a trademark infringement action, APIS

explained that it provides "insurance services, namely, insurance administration, underwriting

insurance in the field of alternative health care provider malpractice, claims administration and

claims processing."  In other words, APIS supplies back-office services for insurance companies

like JMW.

The public description of Uni-Ter[2] suggests it performs substantially the same insurance

administrative function for carriers as APIS mow performs for JMW, which is unsurprising

---

[1] The only precedent for conflating the citizenship of a parent company or holding company with the citizenship of a
subsidiary is in circumstances where the companies are alter egos of each other.  JMW does not contend that APIS is
its alter ego.

[2] See https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=22026391 (last visited May 1,
2017).

considering that one clearly replaced the other. The location of JMW's back office, *i.e.*, the company it wishes to use for administration, is a decision made exclusively by JMW's Board of Directors. It made both decisions, namely, to fire Uni-Ter and hire APIS, in New York. If JMW becomes dissatisfied with APIS, it could replace APIS, and if the Board took that step, it would be doing that in New York. See Utopia Studios, Ltd. v. Earth Tech, Inc., 607 F. Supp. 2d 443, 445 (E.D.N.Y. 2009) ("[T]he salient question [is] where the company's policies originate.").

JMW's reliance on Hertz is misplaced. Hertz was considering the citizenship of an operating company, whereas here, JMW, as noted above, is more akin to a holding company. "In noting that the nerve center of a sprawling operating company and the site of its board meetings may be different, the Hertz Court was not referring to these myriad holding entities, whose limited, ownership-related activities are necessarily 'direct[ed], control[led], and coordinat[ed]' by their boards." Johnson, 853 F. Supp. 2d at 493. "Although the nerve center test is neither as clear-cut nor as simple to determine as the Supreme Court evidently intended, nonetheless, as subsequent courts have recognized, the test focuses on where a corporation's 'high-level' decisions are made, not where day-to-day activities are managed." St. Paul Fire & Marine Ins. Co. v. Scopia Windmill Fund, LP, 87 F. Supp. 3d 603, 605 (S.D.N.Y. 2015) (citing Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC, 636 F.3d 101, 106 (4th Cir. 2011)).

The second line of cases takes a different tack, but may be even closer to the situation here – that is, cases where an inactive company is no longer doing business except to wind down its pre-existing business. The Second Circuit substitutes a "last transaction of business" test for the principal place of business test in such situations. Stated differently, an inactive corporation's last principal place of business before it began to wind down is deemed to continue as its principal place of business after it goes into wind down. For example, in Wm. Passalacqua

Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131 (2d Cir. 1991), one of the plaintiffs had ceased operations, and its sole activity appears to have been joining in the prosecution of a lawsuit for liquidation purposes. The Court of Appeals held that in such circumstances, the principal place of business must be defined as "the place it last transacted business." Id. at 141.

Similarly, in Circle Industries, Inc. v. Parke Cons. Group, Inc., 183 F.3d 105 (2d Cir. 1999), the only business of an otherwise inactive defendant corporation was to wind down its affairs in Georgia, where it had always had its principal place of business. The liquidating defendant contended that since its one officer and director lived in New York, its principal place of business was there. Rejecting that argument, the Second Circle held that "[a]lthough Parke's sole officer and director presently lives in New York and he receives the corporation's mail there, these contacts do not alter its citizenship because the corporation is not transacting business through these activities." Id. at 108. Instead, the Court held that since the corporation's last transaction of business was in Georgia, and it was being wound down in Georgia, its Georgia citizenship continued during the wind-down period. See also Cott Corp. v. Star, No. 12-cv-1004, 2013 WL 5701856, at *6-7 (W.D.N.Y. Oct. 18, 2013) (finding that regardless of where an inactive company is being wound-down, the principal place of business is deemed to be where it last transacted business).

There is some tension between the holding company line of cases and the wind-down line of cases. The former focuses on the decision-making activities of the holding company's board of directors. The latter focuses on the nerve center prior to entry into wind-down, which may or may not be the same. I suppose that to the extent the two lines of cases would yield different conclusions, it would be appropriate in this case to apply the wind-down line of cases, as the

analogy is stronger.  However, there is no conflict on the facts presented here.  If JMW is viewed as an inactive company in wind-down, its last business location was New York; if it is viewed as a holding company that derives any benefit from the activities of a separate company, its business as a holding company is also in New York.  Either way, it is a New York citizen.

## CONCLUSION

Plaintiff's motion to remand [16] is granted.  This case is remanded to New York State Supreme Court, Queens County.  Plaintiffs' motions for extensions of time [34], [36] are denied as moot.

**SO ORDERED.**


_____
U.S.D.J.


Dated: Brooklyn, New York
      May 1, 2017